## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Jamie MEDINA, as the mother and )
next friend for N.M., a minor child )
                             )     Case No. 21-CV-01934
          Plaintiff,       )
                             )
          v.                )     Judge John Robert Blakey
                             )
Nicholas IZQUIERDO, et al.,    )
                             )
          Defendants.     )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Jamie Medina ("Plaintiff"), the mother of her minor son, N.M., brought this suit after two paraprofessionals and a teacher allegedly physically abused N.M. Plaintiff sues the paraprofessionals, Nicholas Izquierdo and Jennifer Aguirre; N.M.'s teacher, Maggie Norton; the Special Education District of Lake County ("SEDOL"); and the school's principal, assistant principal, and SEDOL's superintendent (collectively, "Administration Defendants") pursuant to 42 U.S.C. § 1983 for various constitutional violations. She also seeks indemnification from SEDOL pursuant to state law. The Administration Defendants and SEDOL jointly moved to dismiss, [14], as did Defendant Norton, [34]. Defendant Izquierdo moved to stay the case as to him, [12]. As discussed below, the Court grants in part and denies in part the motions to dismiss, [14], [34], and denies Defendant Izquierdo's motion, [12].

## I.     Factual Background

During the 2018–2019 school year, N.M., a seven-year-old boy with diagnosed behavior disorders requiring specialized assistance, attended Gages Lake School ("Gages Lake"), a special education school in Lake County, Illinois. [1] ¶¶ 6–7. N.M.'s parents chose Gages Lake because it advertised therapies and options to help students like N.M. when they needed to reset and calm down. *Id*. ¶ 29. Prior to enrolling N.M. at Gages Lake, N.M.'s parents told school officials that N.M. did not respond well to "cement rooms" (unpadded isolation rooms). *Id*. ¶ 30. The school officials assured N.M.'s parents that the school had several alternatives to such rooms—a movement room, a library-like calming room, or the principal's office filled with toys and activities—that N.M. could use to calm down. *Id*.

On May 16, 2019, N.M. came home from school upset and in physical pain. *Id*. ¶ 15. He told his father that his lower back/buttocks area hurt because a paraprofessional, Defendant Nicholas Izquierdo, had forcibly grabbed and pulled his leg, causing him to slam to the ground. *Id*. ¶ 16. Earlier that day, the school's principal, Defendant Kris Bacci, and N.M.'s teacher, Defendant Maggie Norton, had called N.M.'s mother—the Complaint is silent about why they called her—but neither mentioned that N.M. had been injured. *Id*. ¶ 17. After N.M. told his parents about his injuries, the parents called the school. *Id*. ¶ 18. Defendant Norton acknowledged that N.M. "had a hard time in the classroom" that day but denied knowing that N.M. was injured or that Defendant Izquierdo may have hurt him. *Id*. The school's vice-principal, Defendant Lynn Byron, said that the school would investigate. *Id*.

The school questioned Izquierdo, but he lied and said N.M. slipped and fell. *Id.*
¶ 19. Izquierdo also claimed that N.M. said he would falsely tell his parents that
Izquierdo tripped him. *Id.* The school officials believed Izquierdo; N.M.'s parents,
unconvinced, insisted that Defendants Bacci and Byron review any video surveillance
footage. *Id.* ¶¶ 20–21. The school had installed video surveillance cameras in the
isolation rooms and in common areas of the school, *id.* ¶ 103, to allow school officials
to monitor behavior and "problematic situations, *id.* ¶ 54, and keep the students safe,
*id.* ¶ 53. By school policy, Gages Lake kept the video footage for thirty days. *Id.* ¶ 32.

Video footage confirmed N.M.'s allegations against Izquierdo. *Id.* ¶ 22. The
footage revealed that N.M. had been placed in an unpadded cement isolation room
with Izquierdo. *Id.* ¶¶ 25, 28. It revealed that Izquierdo, seated on a rolling chair,
tried to snatch N.M.'s legs out from under him. *Id.* ¶ 25. He then cornered N.M.,
flipped him upside down, stripped off N.M.'s shoes and threw them out of the room.
*Id.* ¶ 26. Shortly after, he grabbed and pulled N.M.'s right leg. *Id.* ¶ 27. N.M., his
arms flailing, fell to the ground, knocking his head against the cement wall. *Id.* After
the school officials viewed the footage, they gave Izquierdo the option to resign, which
he accepted. *Id.* ¶¶ 22–23. But the school initially refused to let N.M.'s parents see
the footage, only agreeing after the police and DCFS began to investigate. *Id.* ¶ 24.

The school district also began reviewing other video footage that it had from
the prior thirty days. *Id.* ¶ 32. They learned that N.M. had suffered other physical
abuse. For example, they found that on May 16, 2019, prior to the incident with
Izquierdo, N.M.'s teacher, Defendant Norton, had become aggressive with N.M. in the

classroom, causing him to retreat and crouch into a fetal position. *Id*. ¶ 40. Norton then grabbed N.M. by the wrists and dragged him down the hall to a paraprofessional. *Id*. Norton had not told N.M.'s parents about this incident when they spoke on May 16, 2019. *Id*. ¶ 41. Initially, the school placed Norton on leave, but then permitted her to continue teaching. *Id*. ¶ 42.

Additional video footage showed that N.M. was also sent to an isolation room with Izquierdo on May 10, 2016, where Izquierdo grabbed and pulled N.M.'s leg and yanked him to the ground by holding his upper body. *Id*. ¶ 34. After N.M. was on the ground, Izquierdo remained in his chair seemingly unconcerned that he may have injured N.M. *Id*. ¶¶ 35–36. Izquierdo kept N.M. in the isolation room for 11 minutes before placing N.M. alone in another room for 40 minutes. *Id*. ¶ 37.

In addition, on April 24, 2019, N.M. was sent to the isolation room after he became upset that he could not use the computer. *Id*. ¶ 44. Another paraprofessional, Defendant Jennifer Aguirre, stayed with N.M. in the isolation room. *Id*. ¶ 45. Video footage, once again, showed physical abuse. Specifically, Aguirre "tossed N.M. into the room" when he first arrived. *Id*. ¶ 46. She then struck N.M.'s knees with her own knee, causing him to fall to the ground. *Id*. ¶ 47. She scolded N.M. while he lay on the ground and he began to exhibit "self-injurious behaviors"—hitting, punching and slapping himself. *Id*. Rather than help N.M. or make sure he did not harm himself, Aguirre walked away, leaving N.M. unsupervised. *Id*. A moment later, N.M. began banging his head against the cement wall. *Id*. When N.M. later tried to leave the

room, Aguirre returned, picked him up and "tossed him back in the room and proceeded to kick him." *Id.* ¶ *48.*

Then around May 3, 2019, N.M. was sent to an isolation room for 25 minutes as punishment for touching things in the classroom. *Id.* ¶¶ 49, 52. Aguirre, assigned to the isolation room with him, ripped off the hat he had worn for Hat Day, grabbed him by the wrist and threw him to the ground. *Id.* ¶ 51.

Ultimately, N.M.'s parents learned that N.M. had been sent to an isolation room over 60 times during the school year, all without any notice to them. *Id.* ¶ 58. During the school year, N.M.'s parents noticed that N.M. became afraid to stay alone, even to use the bathroom. *Id.* ¶ 60. They initially ascribed his behavior to typical childhood fears, but now believe his fear stems from the school repeatedly placing him in isolation rooms. *Id.*

DCFS also investigated and reviewed video footage; they found that Defendants Aguirre and Izquierdo had also abused other children in isolation rooms. For example, on April 30, 2019, Aguirre pinned another seven-year-old boy to the wall; when he became upset and kicked her, she grabbed him by the neck and threw him to ground. *Id.* ¶ 64. On May 1, 2019, Izquierdo grabbed a five-year-old boy's leg, causing the boy to fall on his arm. *Id.* ¶ 65. Then on May 8, 2019, Izquierdo pushed an 8-year-old boy in his chest, causing him to fall. *Id.*

In all, in a one-month period, Gages Lake staff physically abused, at the very least, eight students in isolation rooms. *Id.* ¶ 66. In addition, during the 2018–2019 school year, Gages Lake placed students in isolation rooms 1,700 times; 23 percent of

5

these were punitive and not for safety reasons. *Id*. ¶ 61. DCFS opened 21 investigations of possible abuse, *id*. ¶ 62. In August 2019, while the state was investigating Aguirre, she committed suicide.[1] *Id*. ¶ 68. In October 2019, the state criminally charged Izquierdo with six counts of child endangerment. *Id*. ¶ 67.

On April 12, 2021, Plaintiff filed suit in this Court pursuant to 42 U.S.C. § 1983. She sues Defendants Norton, Izquierdo and Aguirre for unreasonable seizure and excessive force in violation of the Fourth and Fourteenth Amendments. [1] (Count I). She also sues them, Defendants Bacci, Byron, and SEDOL's Superintendent Valerie Donnan (collectively "Administration Defendants"), and Defendant SEDOL for violating N.M.'s Fourteenth Amendment substantive due process rights by creating an environment that allowed the abuse to "flourish" (Count II), and for failing to intervene to prevent N.M.'s injuries, *id*. (Count III). Against SEDOL, she brings a § 1983 *Monell* claim (Count IV) and seeks indemnification pursuant to state law, *id*. ¶¶ 108–11. She sues the individuals in both their individual and official capacities. *Id*. at 1.

The Administration Defendants, Defendant SEDOL and Defendant Norton moved to dismiss all claims against them. [14], [34]. Defendants Izquierdo and Aguirre did not move to dismiss, but Izquierdo moved to stay the case as to him while his criminal case remains pending. [12].

In responding to the motions to dismiss, Plaintiff abandoned certain claims as to certain Defendants. [21], [42]. First, she concedes that she cannot maintain

---

[1] Plaintiff sues her estate.

Fourteenth Amendment claims against Defendant Norton because Plaintiff believes that Norton's conduct—cornering N.M. and then dragging him down the hall by his wrists—"while unreasonable, does not literally shock the conscience." [42] at 4.[2] Thus, as to Defendant Norton, Plaintiff abandons her Count I claim based upon a Fourteenth Amendment theory only, and her Count II substantive due process claim. Plaintiff also abandons her claims against the Administration Defendants and Defendant Norton in their *official capacities*.  [21] at 3 n.1.[3]  Finally, she abandons Counts II and III against Defendant SEDOL.  [21] at 12 n.2.

That leaves the following claims against the moving defendants:  (1) Count I Fourth Amendment violation against Defendant Norton; (2) Count II Fourteenth Amendment substantive due process claim against the Administration Defendants; (3) Count III "failure to intervene" claim against the Administration Defendants and

---

[2] Even if the force Norton used against N.M. arguably shocks the conscience, Plaintiff still may not be able to pursue a Fourteenth Amendment claim against Defendant Norton.  The Supreme Court has instructed that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). The Seventh Circuit has found that the Fourth Amendment governs claims for unreasonable seizure and excessive force in the school context at least where the excessive force is incidental to a seizure. *See Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1012 (7th Cir. 1995) ("We do not believe the Fourteenth Amendment's Due Process Claus affords Wallace any greater protection than the Fourth Amendment").  Plaintiff also brought a Fourth Amendment claim against Norton (Count I), which she did not abandon.

[3] Plaintiff does not explicitly concede her official capacity claims against Defendant Norton, but she fails to respond to Defendant Norton's arguments on the official capacity claims against her, and instead only argues about Norton's individual liability. [42], [45] at 2–3.  Accordingly, Plaintiff waived her official capacity claims against Defendant Norton, as well.  Further, dismissal remains warranted regardless of waiver because Plaintiff also sues SEDOL and official capacity claims against individual school personnel should be dismissed when they are duplicative to those alleged against the governing school body. *See Jaythan v. Bd. of Educ. of Sykuta Sch.*, 219 F. Supp. 3d 840, 844 (N.D. Ill. 2016) (dismissing official capacity claims against individual teachers as duplicative).

Defendant Norton; and (3) Count IV *Monell* claim against Defendant SEDOL. The Court considers each below, as well as Defendant Izquierdo's motion to stay. [12].

## II. Defendant Izquierdo's Motion to Stay

Defendant Izquierdo moves to stay the case as to him while his criminal case remains pending. [12] ¶ 3. His motion, filed on June 3, 2021, states that his criminal matter "will likely be continued further." *Id.* Plaintiff objects to his motion for various reasons. [22].

Since Defendant Izquierdo filed his reply on July 30, 2021, he has not updated the Court on the status of his criminal case. Without an updated status of his criminal case, the Court cannot determine whether the stay that he requested months ago remains warranted or necessary. Therefore, the Court denies Defendant Izquierdo's motion to stay without prejudice.

## III. Motions to Dismiss

### A. Standard of Review

To survive a 12(b)(6) motion, a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so that the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief that allows a court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully.

*Id.* at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action" and mere conclusory statements "do not suffice." *Id.* When evaluating complaints under Rule 12(b)(6), courts accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.*

**B.    Jurisdiction/Failure to Exhaust**

Defendant Norton, in addition to moving to dismiss pursuant to Rule 12(b)(6), argues that the Court lacks subject matter jurisdiction over this suit because Plaintiff failed to exhaust administrative remedies as required by the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400. [34] ¶ 8. She insists that Plaintiff's claims, although not pled as such, "boil down to her disagreement with the behavior interventions, support, and strategies implemented to address N.M.'s behavioral disorders, which are merely thinly disguised FAPE claims." *Id.* "FAPE" refers to the Provision of Free Appropriate Education, and the IDEA requires exhaustion of administrative remedies of FAPE claims before filing a civil action. *Id.*

The Court disagrees with Norton's characterization of Plaintiff's claims. Indeed, Defendant Norton's argument borders on the frivolous. As Plaintiff points out, parents of children with disabilities may work with school officials to design an individualized education program ("IEP") that ensures the student receives a FAPE. [42] at 5. When disputes arise regarding the student's IEP, the IDEA requires that parent's exhaust certain administrative remedies before pursuing a civil claim. Here, there exists no indication at all that Plaintiff's claims of physical abuse and mistreatment relate to N.M.'s IEP or constitute "thinly disguised FAPE claims," [34] ¶ 8. The Complaint does not allege that the "no cement room" request was part of

9

N.M.'s IEP, and N.M.'s right to be free from unreasonable seizures, excessive force and physical abuse does not come from his IEP, but from the Constitution. The law does not require disabled students to exhaust administrative remedies before bringing § 1983 claims for alleged physical abuse by state actors. *See, e.g., Doe Child by Doe v. Stark Cnty. Comm. Unit Sch. Dist. #100*, No. 19-1215, 2019 WL 6702538, at *2–3 (C.D. Ill. Dec. 9, 2019) (holding IDEA did not apply to disabled student's § 1983 claims that a school aide abused her); *J.P. v. Williamson Cnty. Educ. Servcs.*, No. 16-cv-879, 2018 WL 9651501, at *5 (S.D. Ill. Mar. 27, 2018) (holding IDEA did not apply to disabled student's allegations that school staff confined and abused him). Defendant Norton's argument to the contrary has no merit.

### C. Fourth Amendment Unreasonable Seizure and Excessive Force (Count I) Claim against Defendant Norton

Defendant Norton moves to dismiss the Fourth Amendment unreasonable seizure and excessive force claim (Count I) against her. [35] at 3–6. According to her, she did not violate N.M.'s constitutional rights as a matter of law because she acted reasonably under the circumstances when she took N.M. by the wrists and dragged him down the hallway. *Id.* She also asserts she is entitled to qualified immunity. *Id.* at 11–12.

The Supreme Court and Seventh Circuit have extended Fourth Amendment protection to public school students against unreasonable searches and seizures by school personnel. *See N.J. v T.L.O.*, 469 U.S. 325, 341–42 (1985) (applying the Fourth Amendment to student searches); *Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1012 (7th Cir. 1995) (extending Fourth Amendment protection to seizures

of students). Generally, a seizure runs afoul of the Fourth Amendment if accomplished through excessive force. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009). The Seventh Circuit has held, however, that "in the context of a public school, a teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent." *Wallace*, 68 F.3d at 1014. Teachers may employ "reasonable action" to "maintain order and discipline," which may include, depending on the circumstances, "the seizure of a student in the face of provocative or disruptive behavior." *Id*. Courts examine the Fourth Amendment "reasonableness" standard from an objective perspective. *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 399 (1989)).

Defendant Norton argues that N.M. had "a significant behavior disability" and she had the right to "escort" N.M. "out of a classroom, even to the point of force." *Id*. at 6. She maintains that the force she used—grabbing him by the wrists and dragging him down the hallway—constitutes "reasonable action" as matter of law. *Id*. At this early stage in the case and based upon Plaintiff's Complaint, the Court cannot find as a matter of law that Defendant Norton used objectively reasonable force, especially where her actions included choosing to forcibly drag a disabled child down a hallway.

Defendant Norton tries to analogize this case to the facts in *Wallace*, where the court found that a teacher acted reasonably when he briefly pulled a high school student by the elbow to remove her from the classroom after she threatened to beat up another student, 68 F.3d at 1015. [35] at 4–5. But the Seventh Circuit decided

11

*Wallace* on summary judgment based on a fully developed record. 68 F.3d at 1015. And *Wallace* is clearly distinguishable where, among other factors, the facts showed: (1) the student was a teenager; (2) she had just threatened to harm another student; (3) she disobeyed multiple orders to leave the classroom; and (4) the teacher only briefly pulled the student's elbow and let go when she objected. *Id.* Here, in contrast, Defendant Norton physically intimidated a seven-year-old boy causing him to retreat into the fetal position, and then she grabbed him by the "wrists and dragged him down the hallway." [1] ¶ 40. Even if N.M. struggled with behavioral challenges, the reasonableness determination "requires a close scrutiny of the factual circumstances under which the seizure allegedly took place." *Jaythan v. Bd. of Educ. of Sykuta Elem. Sch.*, 219 F. Supp. 3d 840, 845 (N.D. Ill. 2016) (denying motion to dismiss Fourth Amendment claim against a student because facts not sufficiently developed) (internal citation omitted)). The Court cannot find, as a matter of law, and based on the Complaint's allegations that Defendant Norton acted reasonably under the circumstances.

Defendant Norton also faults Plaintiff for omitting from the Complaint "*any* description about what precipitated Norton's alleged 'assault'" even though, according to Norton, video documenting the entire incident shows she acted reasonably under the circumstances. [35] at 6, 6 n.1. A complaint, however, need not allege every detail of an event to satisfy the rule's notice pleading requirement. Instead, it must allege sufficient facts to render the allegations plausible. *Ashcroft*, 556 U.S. at 678. Plaintiff's Complaint more than satisfies this requirement. Norton's

arguments—that other evidence will show she used reasonable force—cannot be considered on a motion to dismiss based on the facts as alleged. And the Court declines to convert Norton's motion to one for summary judgment since she does not provide any evidence for the Court to consider other than her say-so.

Next, Defendant Norton argues that, even if Plaintiff sufficiently alleged a Fourth Amendment claim against her, the Court should dismiss it based on qualified immunity. [35] at 11–12. Qualified immunity protects government actors from liability for damages under § 1983 to the extent their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 231 (2009). Defendant Norton raises only one argument in favor of dismissing based on qualified immunity: that Plaintiff "failed to show Norton violated N.M.'s constitutional rights under the Fourth or Fourteenth Amendments." *Id*. at 12. As set out above, however, the Court finds that Plaintiff adequately alleges a Fourth Amendment claim against Norton. Further, as discussed above, Supreme Court and Seventh Circuit precedent at the time of the incident clearly established that public school students enjoy constitution rights against unreasonable searches and seizures by school personnel. Thus, Defendant Norton is not entitled to dismissal based on qualified immunity.

Accordingly, Plaintiff may proceed to discovery on her Count I Fourth Amendment claim against Defendant Norton who may re-raise her reasonableness and qualified immunity defenses at a later stage, if appropriate based on the evidence.

### D.    Substantive Due Process Claim (Count II)

The Court next considers Plaintiff's Count II substantive due process claim against the Administration Defendants.  This claim, titled "Violation of Substantive Due Process (State Created Danger/Special Relationship)," alleges that the Administration Defendants had full responsibility to protect N.M., but failed to do so and affirmatively placed him "in positions of danger that he would not have otherwise faced."  [1] Count II, ¶¶ 82–83.[4]

Count II's references to "special relationship" and "state created danger" arise from two exceptions to the Supreme Court's general rule in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195 (1989), that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."  *See also Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (discussing *DeShaney* and the two exceptions).  The Administration Defendants argue that Plaintiff cannot make out a substantive due process claim against them under either theory.  [15] at 7–11.

In response, Plaintiff concedes that no special relationship existed between N.M. and the state, [21] at 8, and this Court agrees.  The Seventh Circuit has held that no special relationship exists between schoolchildren and the state because "the

---

[4] The Plaintiff also brings Count II against Defendants Aguirre and Izquierdo based upon their alleged physical abuse of N.M.  [1] ¶¶ 80–86.  While neither moved to dismiss formally, the Court dismisses Count II as to them, because it is redundant to Count I, which alleges a Fourth and Fourteenth Amendment claim against Defendants Aguirre and Izquierdo based upon their alleged physical abuse. *Id.* ¶ 76. In addition, the Fourth Amendment governs their alleged constitutional violations. *See* n.2, *supra*.

government, acting through local school administrators, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises." *J.O. v. Alton Comm. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990).

As to the "state-created danger" theory, the parties dispute whether Plaintiff sufficiently alleges the elements of the state-created danger theory.[5]  Plaintiff insists she can succeed because the Administration Defendants "turned a blind eye to the rampant physical and verbal abuse of the students at Gages Lake school" and "help[ed] hide the teachers and staff's abuse of the student," which "allowed the abuse to flourish."  [21] at 3–5.  Defendants disagree.

Nevertheless, this dispute ignores a fundamental point: the "state-created danger" theory was created as one of the exceptions to *DeShaney*'s general holding that a state need not protect "its citizens against invasion by *private actors*." *DeShaney*, 489 U.S. at 195 (emphasis supplied); *see also First Midwest Bank Guardian of Est. of LaPorta v. City of Chi.*, 988 F.3d 978, 987 (7th Cir. 2021) (first finding that an off-duty Chicago police officer committed an "act of private violence" before considering *DeShaney* and the state-created danger exception to holding Chicago liable).  This case does not involve private actors.  Here, Plaintiff alleges that state actors—Defendants Norton, Aguirre, and Izquierdo—harmed N.M. by grabbing him and dragging him down the hallway (Norton) and physically abusing him in an

---

[5] To bring a substantive due process claim against state actors based upon the "state-created danger" exception, a plaintiff must establish that: (1) the state, by its affirmative acts, created or increased a danger to plaintiff; (2) defendants' failure to protect the plaintiff proximately caused the injuries; and (3) defendants' failure to protect the plaintiff "shock[s] the conscience."  *King ex rel. King v. East St. Louis. Sch. Dist. 189*, 496 F.3d 812, 818 (7th Cir. 2007).

15

isolation room (Izquierdo and Aguirre).[6]  Importantly, "[n]othing in *DeShaney* suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates." *Id.* at 725 (*citing City of Canton v. Harris*, 489 U.S. 378 (1989)).[7]  Accordingly, the state-created danger theory—developed as an exception to *DeShaney*—does not dictate whether Plaintiff alleges a viable substantive due process claim against the Administration Defendants.  Consequently, the Court instead considers whether there exists another basis to hold the Administration Defendants individually liable for their subordinates' conduct.

### 1.    Administration Defendants' Liability for Subordinates' Misconduct

State actors may be held liable for a subordinate's constitutional violations if they are "personally involved in the conduct," including if they "know about the [unconstitutional] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."  *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010) (quoting *Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988)).  A supervisor's mere negligence or gross negligence will not suffice, however; the supervisor must "act

---

[6] Plaintiff clearly believes Defendants Aguirre, Izquierdo and Norton acted "under color of state law" since she brings § 1983 claims against them for their alleged conduct.  And Defendants did not argue that Defendants Aguirre, Izquierdo or Norton acted in their private capacities when they allegedly mistreated N.M.

[7] Tellingly, in defending her substantive due process claim, Plaintiff principally relies on a third circuit case, *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3d. Cir. 1989), and its progeny.  As discussed later in this opinion, *Stoneking* did not rely on a "state-created danger" theory.  In fact, it held that *DeShaney* did not apply because "DeShaney's injuries resulted at the hands of a private actor, whereas Stoneking's resulted from the actions of a state employee." *Id.*

either knowingly or with deliberate, reckless indifference."[8] *Jones*, 856 F.2d at 992. Further, there must exist a "causal connection, or an affirmative link, between the misconduct complained of and the official sued." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).

Plaintiff alleges that the Administration Defendants should be held personally liable because they "turned a blind eye to the rampant physical and verbal abuse of the students at Gages Lake school," "help[ed] hide the teachers and staff's abuse of" N.M. and enacted policies that "allowed the abuse to flourish." [21] at 3–5. In so arguing, Plaintiff principally relies upon a third circuit opinion, *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3d Cir. 1989). *See* [21] at 5–7. There, a plaintiff brought § 1983 claims against school administrators after her high school teacher sexually abused her for years. *Stoneking*, 882 F.2d at 722. The plaintiff acknowledged that she never told the administrators about the abuse but alleged that *other students* had complained to the administrators that teachers (including plaintiff's alleged abuser) abused them. *Id.* The plaintiff argued that the administrators concealed these complaints and discouraged the students from complaining, thereby violating her constitutional rights by "adopting and

---

[8] In *Slade v. Bd. of Sch. Dirs. of City of Milwaukee*, 702 F.3d 1027 (7th Cir. 2012), the court cautioned that the term "deliberate indifference," which courts often use to describe the personal liability standard in § 1983 claims, does not necessarily mean the criminal recklessness standard in which "knowledge is required" rather than the lower civil recklessness standard where "it is enough that the risk is obvious." *Id.* at 1030. The *Slade* Court implied that the standard for § 1983 claims should be the lesser "known or obvious" standard but declined to resolve this because in most cases, including the one before it, "there is little difference between known and obvious, the former being the natural inference from the latter." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 871 (1994)). But the court acknowledged that the distinction may matter in the rare instances in which "the risk might be obvious to the normal person, but the defendant might be especially obtuse." *Id.* At this stage in the proceeding, this case has not presented itself as such a "rare instance."

maintaining a practice, custom or policy of reckless indifference to sexual abuse" that "created a climate which [] facilitated sexual abuse of students by teachers." *Id.* at 724–25. The Third Circuit agreed, holding that, "although a mere failure of supervisory officials to act or investigate cannot be the basis of liability," officials may not "with impunity maintain a custom, practice or usage that communicated condonation or authorization of assaultive behavior." *Id.* at 730. It held that the plaintiff had submitted adequate evidence that the administrators, through the way they handled prior sexual abuse complaints, had "encourage[ed] a climate to flourish where innocent girls were victimized." *Id.* at 731.

As Defendants point out, [33] at 8, the Seventh Circuit has not formally adopted the *Stoneking* holding. The Seventh Circuit, however, did positively cite it in *J.O. v. Alton Community Unit School District 11*. *See* 909 F.2d 267, 272 (7th Cir. 1990). In *J.O.*, parents brought constitutional claims after a teacher allegedly abused minor students. Among other things, the parents claimed the school administrators violated the Fourth and Fourteenth Amendment based on a special relationship with the students that created an "affirmative duty to provide for [the students'] safety and to prevent the child abuse." *J.O.*, 909 F.2d at 272. The Seventh Circuit affirmed dismissal because there existed no special relationship between the state and school children, but it also held that the district court should have allowed the plaintiffs leave to amend. *Id.* It commented that plaintiffs may have a viable claim against the administrators if they can allege that the administrators "promoted school

policies that 'encourag[ed] a climate to flourish where innocent [children] were victimized." *Id*. (quoting *Stoneking*, 882 F.2d at 730).

Twenty years later, the Seventh Circuit reasserted its support for a *Stoneking* theory in *T.E. v. Grindle* where it upheld a lower court finding of personal liability of a school principal based upon reasoning similar to *Stoneking*. 599 F.3d at 588–90. In *Grindle*, a teacher sexually abused numerous students and the students complained in person and in writing to the principal. Yet, the principal took no action against the teacher and instead ostensibly covered up the allegations. *Id*. The Seventh Circuit agreed that, even if it had never decided a case based on the *Stoneking* theory, such a theory seems viable. *See id.* at 590. It then affirmed the lower court, finding that the principal "could be held liable for turning a blind eye to and affirmatively covering up evidence of child sexual abuse by one of her teachers." *Id*.

Accordingly, both *Grindle* and *J.O.* confirm that the Seventh Circuit has "tacitly approved" the *Stoneking* theory that "a substantive due process claim can stand where the plaintiff puts forth enough evidence to demonstrate that an individual defendant turned a blind eye to constitutional violations thereby allowing a climate to flourish where innocent students are victimized." *Sandra T.E. v. Sperlik*, 639 F. Supp. 2d 912, 920–21 (N.D. Ill. 2009); *see also Doe v. Bd. of Educ. of Consol. Sch. Dist. 230 Cook County, Il.*, 18 F. Supp. 2d 954, 959 (N.D. Ill. 1998) (finding that the Seventh Circuit has implicitly accepted *Stoneking*); *Doe By and Through Doe v.*

19

*Evanston Tp. Sch. Dist. 202*, 93-C-1011, 1994 WL 55652, at *1–2 (N.D. Ill. Feb. 23, 1994) (same).

With that established, the Court now turns to whether the Complaint sufficiently alleges a substantive due process claim against the Administration Defendants. The Complaint alleges that the school sent students to an isolation room 1,700 times during the 2018–2019 school year, and 23 percent of these "were punitive and not for safety reasons." [1] ¶ 61. It also alleges that DCFS's investigation revealed that in a one-month period, District staff physically abused at least eight students in the isolation rooms. *Id*. ¶ 66. Further, it alleges that Defendants Izquierdo, Aguirre, and Norton abused N.M. "in common areas of the school, including the hallway and doorways of isolation rooms, and in isolation rooms where video monitor surveillance was installed" and that "the administration routinely ignored the surveillance videos." *Id*. ¶¶ 54–55, 103. Further, the Complaint alleges that the district's "leaders, supervisors and policymakers" allowed the abuse to flourish through their explicit and *de facto* policies and failure to adequately discipline staff when issues arose. *Id*. ¶¶ 97–107.

Plaintiff argues that, from these allegations, the Court should infer that Administration Defendants knew about the abuse or otherwise turned a blind eye to it. According to Plaintiff, Defendants Bacci and Byron, as the Principal and Assistant Principal, respectively, "would be at the school while classes were in session" and must have "observed the misconduct" because N.M. was abused in isolation rooms equipped with video surveillance or in the school's common areas. [21] at 8.

Similarly, Plaintiff argues that Defendant Donnan, the Superintendent, was "at the school and would be aware of the way SEDOL teachers and staff mistreated students." *Id*. Plaintiff also alleges that the Administration Defendants encouraged the abuse to flourish through the actual and *de facto* policies they implemented and their failure to periodically review video footage available to them. *Id*. at 4, 7. Finally, Plaintiff alleges that the Administration Defendants tried to cover up N.M.'s alleged abuse, which further shows their deliberate indifference and culpability. *Id*. at 7.

Given the Administration Defendants' supervisory roles, the striking number of instances of isolation room use, especially as a punitive measure, and the frequency with which abuse occurred in a one-month period, one can plausibly infer that the Administration Defendants "turned a blind eye" to student abuse and implemented explicit or *de facto* policies, which allowed the abuse to flourish.[9] Furthermore, while their alleged failure to periodically review video footage, without more, may not suffice to infer deliberate indifference; it certainly supports an inference of deliberate indifference when coupled with the other allegations including the alleged *de facto* policies and failure to train staff. Likewise, the Administration Defendants' alleged decision to not review the video footage after Plaintiff complained to them, combined

---

[9] At various points, the Complaint paints with a broad-brush and resorts to group-pleading where it references "policymakers" and "supervisors" and does not explicitly allege the individual role each Administration Defendant played in the policy decisions at issue. This unfortunate group-pleading makes it difficult to ascertain exactly how the Administration Defendants *all enacted policies* that allowed the abuse to flourish. Clearly, if this were summary judgment, such broad allegations, without more, may not suffice. *Cf. Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) (noting that supervisors can only be held liable for their personal involvement in unconstitutional conduct, which must rise above inactionable negligence or gross negligence). But this is not summary judgment, and the Complaint meets (albeit barely) the requirements of notice pleading.

21

with their refusal to allow Plaintiff to see the footage (ostensibly a cover-up showing consciousness of guilt) further supports an inference of deliberate indifference. Accordingly, Plaintiff has sufficiently pled a substantive due process claim against the Administration Defendants.

### 2. Administration Defendants' Qualified Immunity.

The Administration Defendants also argue that they are entitled to qualified immunity as to Count III. [15] at 10–14. As discussed above, qualified immunity protects government actors from liability if the conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 231 (2009). "Clearly established" means that: (1) various courts have found that "certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand;" or (2) the constitutional violation is "patently obvious" and "no reasonable [official] could have thought he was acting lawfully." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (internal citations omitted).

Here, accepting all well-pled allegations as true, the Administration Defendants' qualified immunity argument fails at this point in the proceedings. The Court already found that the Complaint sets out a viable substantive due process claim against the Administration Defendants. Furthermore, the Supreme Court long ago recognized that students have a protected liberty interest in bodily integrity. *See Ingraham v. Wright*, 430 U.S. 651, 672 (1977) (addressing corporal punishment of students). And, the Seventh Circuit has also found, under similar circumstances, that school administrators can violate the constitution through deliberate

indifference to student abuse—by affirmatively covering it up, turning a blind eye to it, or enacting policies that allow it to flourish. *See, e.g. Grindle*, 599 F.3d at 590 (finding deliberate indifference for turning a blind eye and covering up student abuse and affirming denial of qualified immunity); *J.O.*, 909 F.2d at 272 (same). Accordingly, based on the current record, the Administration Defendants are not entitled to qualified immunity on Count II via a motion to dismiss.

### E. Failure to Intervene (Count III)

Plaintiff also alleges a "failure to intervene" theory of liability against the Administration Defendants and Defendant Norton for failing to intervene to stop N.M.'s physical abuse. [1] Count III. A state actor may be liable for failing to intervene "in an imminent or ongoing constitutional violation." *Sandra T.E. v. Sperlik*, 639 F. Supp. 2d 912, 920 (N.D. Ill. 2009). These claims frequently arise in excessive force cases against police officers where one officer is present during the incident but fails to stop other officers from using excessive force. *See, e.g., Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). To succeed, a plaintiff must establish that the defendant knew of the alleged violation; it is not enough to allege that the defendant "should have known." *Sperlik*, 639 F. Supp. at 920. Further, a state actor may only be liable under a failure to intervene theory "if he or she fails to intervene in an imminent or ongoing constitutional violation." *Id.*

As to the Administration Defendants, Plaintiff reiterates the arguments she made in support of her substantive due process claim. [21] at 9. But a failure to intervene theory does not impose liability for "failing to prevent (or predict)" a future constitutional violation, even if the state actor knows of and ignores risk of this future

violation.  *Sandra T.E.*, 639 F. Sup. at 920.  Although Plaintiff adequately alleges a substantive due process claim against the Administration Defendants based on deliberate indifference, Plaintiff does not adequately allege a claim for failure to intervene.  That is, even if they turned a blind eye to student abuse (which allowed it to flourish and caused N.M.'s abuse), Plaintiff does not sufficiently allege that they knew of and then failed to intervene in imminent abuse of N.M.  Accordingly, Plaintiff has not properly alleged a failure to intervene theory against the Administration Defendants.

As to Defendant Norton, Plaintiff argues that Norton knew or should have known of "Izquierdo's and Aguirre's abuses and failed to address them."  [42] at 4 (quoting [1] ¶ 2).  This argument fails for the same reasons as the intervention claims against the Administration Defendants.  Plaintiff must allege that Defendant Norton knew (not just that she should have known) of N.M.'s abuse either imminently before it occurred or while it was ongoing.  Plaintiff fails to do so.

Finally, in support of her failure to intervene claim against Defendant Norton, Plaintiff argues that "Norton participated in a knowing coverup upon learning of Izquierdo's physical attack" and "was placed on leave by her employer" when the facts surfaced.  [42] at 4 (citing [1] ¶¶ 17–18, 41–42).  Plaintiff fails to explain how these allegations support a failure to intervene claim against Norton.  The alleged "coverup" occurred after N.M.'s parent reported the suspected abuse, and the Complaint alleges that Norton was placed on leave because of her own conduct toward N.M. in the classroom, not because of possible involvement in Izquierdo's subsequent abuse.

24

Accordingly, the Court dismisses without prejudice Count III as to the Administration Defendants and Defendant Norton.

### F.    Monell Claim (Count IV)

The Court now turns to Plaintiff's Count IV *Monell* Claim against Defendant SEDOL.  *See Monell v. Dep't of Social Srvcs.*, 436 U.S. 658 (1978).  Among other things, Plaintiff alleges that SEDOL caused N.M.'s injuries through *de facto* policies of: (1) using isolation rooms as a form of punishment without monitoring them; (2) using physical force to put or keep students in isolation rooms; and (3) keeping students in isolation rooms for prolonged periods.  [1] ¶¶ 95, 100–101.  Plaintiff also alleges that SEDOL failed to promulgate rules or properly train, supervise, discipline, monitor, or control staff on: (1) crisis techniques; (2) when and how to use physical contact with students; and (3) investigating and meaningfully disciplining staff abuse of students.  *Id.* ¶¶ 95–96, 101, 105.  Plaintiff also alleges that SEDOL knew or should have known about the widespread and routine physical and psychological staff abuse of students at Gages Lake School.  *Id.* ¶ 106

Under *Monell*, a municipal entity may be liable for depriving a plaintiff of constitutional rights only if the entity caused the deprivation.  436 U.S. at 691–92. Liability under *Monell* remains "difficult to establish precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct."  *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020), *cert. denied sub nom. Polk Cnty., Wis. v. J.K. J.*, 141 S. Ct. 1125 (2021) (citing *Monell*, 436 U.S. at 690–91).  To establish that a municipality caused a deprivation, a plaintiff may allege "an express policy (embodied, for example, in a policy statement, regulation, or

decision officially adopted by municipal decisionmakers), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality." *J.K.J.*, 960 F.3d at 377 (citing *Glisson v. Ind. Dept. of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017)).  Plaintiff "must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged"—that is, Plaintiff must "show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *J.K.J.*, 960 F.3d at 377 (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997) and citing *Monell*, 436 U.S. at 694).

Here, Plaintiff's *Monell* claim rests in part on SEDOL's alleged inaction: its failure to enact rules or implement proper training.  "[A] 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [municipality] itself to violate the Constitution.'" *J.K.J.*, 960 F.3d at 378 (quoting *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011)). The requisite "notice" may "come from a pattern of past similar violations; other times it will come from evidence of a risk so obvious that it compels municipal action." *J.K.J.*, 960 F.3d at 381.  Furthermore, failure to train can give rise to *Monell* liability in limited circumstances where the failure reflects "a high degree of culpability on the part of the policymaker." *Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir. 1993).  To avoid using a failure to train theory to create vicarious municipal liability, the plaintiff typically must show "a pattern of

26

similar constitutional violations by untrained employees…to demonstrate deliberate indifference" by policymakers who "knew or should have known the training was inadequate and nevertheless disregarded the consequences." *Sanchez v. Garcia*, No. 12 C 6347, 2015 WL 2097606, at *5 (N.D. Ill. May 4, 2015) (quoting and citing *Connick*, 563 U.S. at 61).

Taking together the alleged *de facto* isolation room policies and SEDOL's failure to train its staff, Plaintiff sufficiently states a *Monell* claim. Plaintiff alleges that SEDOL administrators with final policy-making authority created policies of overusing isolation rooms, frequently as a form of punishment. And SEDOL failed to adequately train its staff, teachers and paraprofessionals in how to diffuse situations when students became disruptive or upset, or when and how to use physical contact with students. Pursuant to this alleged policy, Gages Lake made abundant use of isolation rooms—1,700 instances in the 2018–2019 school year with a quarter of those punitive, *id.* ¶ 61. And, in only a one-month period, these allegedly undertrained staff abused at least eight students in the isolation rooms, including N.M. [1] ¶ 66. For purposes of a motion to dismiss, this suffices to show a "pattern of similar constitutional violations," *Sanchez*, 2015 WL 2097606, at *5, and a "risk so obvious that it compels municipal action," *J.K.J.*, 960 F.3d at 381. It also suffices to show a direct causal link to N.M.'s constitutional deprivations. Accordingly, Plaintiff adequately alleges a *Monell* claim.

For the first time in reply, however, Defendant SEDOL also argues that it does not have the capacity to be sued. It argues that under Illinois law, 105 ILCS 5/10-2,

27

only a school district's board of education is amenable to suit. [33] at 14 n.3. Although the Court generally does not entertain arguments newly raised in reply, the parties and Court will only waste resources if Plaintiff continues with claims against the wrong defendant. Furthermore, Plaintiff agreed to dismiss her official capacity claims against the individual defendants only because *Defendants* (including SEDOL) argued in their opening motion that these official capacity claims are redundant to Plaintiff's claims against SEDOL, [1] at 15.

Based on the Court's review of 105 ILCS 5/10-2 and relevant caselaw, it appears that SEDOL cannot be sued. An Illinois school district is merely a geographic area. *See Coony v. Soc'y of Mount Carmel*, 389 N.E.2d 549, 551 (Ill. 1979); 105 ILCS 5/1-3. Illinois courts have held that Illinois' school code "expressly authorizes a board of education to sue and be sued in court proceedings" and a school district lacks the capacity for suit "unless specifically authorized" in "a companion statute." *Bd. Of Educ. of Bremen High Sch. Dist. No. 228 v. Mitchell*, 899 N.E.2d 1160, 1166 (Ill. App. Ct. 2008); *see also Snow v. J. Sterling Morton High Sch. Dist. 201*, No. 16-cv-2685, 2016 WL 5391222, at *2 (N.D. Ill. Sept. 27, 2016) (dismissing Title VII claim against school district with leave to amend to name the board of education); *Klean v. Bd. Of Educ. of Proviso Twnshp Sch. Dist. 2019, et al.*, No. 08 C 6233, 2010 WL 3732218, at *2 (N.D. Ill. Sept. 17, 2010) (dismissing *Monell* claim against a school district because only the Board, not district, was amenable to suit).

Plaintiff's Complaint does not identify an Illinois statute that permits suit against SEDOL. Accordingly, it appears that 105 ILS 5/10-2 governs, and Plaintiff

should have named SEDOL's Board of Education for her *Monell* and state law indemnification claims. On that technical basis, the Court grants, without prejudice, Defendants' motion to dismiss Plaintiff's *Monell* and state law indemnification claims against SEDOL so that she may amend her Complaint to name the proper entity as a defendant.

## IV.     Conclusion

For the reasons explained above, the Court grants in part, and denies in part, the motions to dismiss, [14], [34], and denies Defendant Izquierdo's motion to stay, [12]. The Court dismisses with prejudice all claims against the Administration Defendants and Defendant Norton *in their official capacities* as well as Counts II and III against SEDOL. The Court also dismisses without prejudice Count II as to Defendants Norton, Izquierdo and Aguirre and Count III as to Defendant Norton and the Administration Defendants. Finally, it dismisses Count IV and the indemnification claim as to SEDOL but grants Plaintiff leave to amend to name the proper entity. Plaintiff may file an amended complaint on or before April 18, 2022. The parties shall file a joint status report by April 25, 2022, proposing a reasonable fact discovery schedule, indicating whether the parties require expert discovery, and indicating whether any party plans to seek summary judgment. Defendant Izquierdo shall also file a status report on or before April 4, 2022, providing an update regarding the status of his criminal case and indicating whether he plans to renew his motion to stay. If he wishes to renew his motion to stay, he shall do so by April 11, 2022.

Dated: March 28, 2022                    Entered:

John Robert Blakey
United States District Judge

30